# United States Court of Federal Claims

No. 11-77 V
(Filed Under Seal:  August 21, 2014)
(Reissued:  September 5, 2014)[*]

_____

**SHERRIL K. STILLWELL,**

*Petitioner,*

**v.**

**SECRETARY OF HEALTH
AND HUMAN SERVICES,**

*Respondent.*

_____

Vaccine Act; Vaccine Injury;
Motion for Review; ADEM;
Diagnosis; Influenza;  Flu
Vaccination; Preponderance of
Evidence

*Sol P. Ajalat, Esq.*, Ajalat & Ajalat, North Hollywood, CA, for petitioner.

*Alexis B Babcock, Esq.*, United States Department of Justice, Vaccine/Torts Branch, Civil Division, Washington, DC, for respondent.

## OPINION

**Block,** *Judge.*

This case is before the court on a motion to review ("Pet'r's Mot.") then Chief Special Master ("CSM") Campbell-Smith's decision to dismiss petitioner's claim for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program" or "Vaccine Act"), 42 U.S.C. § 300aa-1 to -34, which provides compensation to individuals who can establish, by a preponderance of the evidence, that they have suffered "a vaccine-related injury." § 300aa-11(c)(1)(C).   Petitioner, Sherril K. Stillwell, alleges that she developed acute demyelinating encephalomyelitis ("ADEM") as a result of an influenza ("flu") vaccine she received on February 22, 2008.[1]  Pet. at 1.  After holding an evidentiary hearing on the matter, the CSM concluded, on June 17, 2013, that petitioner had failed to prove by a preponderance of the evidence that she was suffering from ADEM, and denied compensation.  *Stillwell v. Sec'y of Health & Human Servs.*, ("*Stillwell I*") 2013 WL 4540013 (Sp. Mstr. Fed. Cl. June 17, 2013).

_____

[*] This opinion originally was issued under seal on August 21, 2014.  The court afforded the parties an opportunity to propose redactions in the opinion prior to its reissue.  No such redactions were proffered.  Accordingly, herewith is the reissued opinion without redactions.

[1] In her petition, petitioner alleged that she suffered from "encephalomyelitis," a general term for inflammation of the brain and spinal cord, which includes a wide range of disorders.  *Dorland's Illustrated Medical Dictionary* 608 (31st ed. 2007).  Subsequently, however, petitioner's expert witness, Dr. Marcel Kinsbourne, alleged that petitioner was suffering from acute demyelinating encephalomyelitis or ADEM. *See* Pet'r's Ex. 8 at 3, ECF No. 11.

Petitioner contends the CSM erred on two fronts.  Pet'r's Mot. at 4-13.  First, petitioner argues that the CSM applied an incorrect legal standard.  Pet'r's Mot. at 4-5.  In petitioner's view, the CSM mistakenly applied the standard for determining whether petitioner suffered an actual injury, set forth in *Broekelschen v. Sec'y of Health and Human Servs.*, 618 F.3d 1339 (Fed. Cir. 2010) and *Lombardi v. Sec'y of Health and Human Servs.*, 656 F.3d 1343, 1352 (Fed. Cir. 2011), instead of the three-prong test for causation-in-fact established in *Althen* v *Sec'y of Health and Human Servs.*, 418 F.3d 1274 (Fed Cir. 2005).  *Id.*  Second, petitioner argues that the CSM's determination that petitioner was not suffering from ADEM and findings in support thereof were arbitrary and capricious.  Pet'r's Mot. at 5-13.

For the reasons explained below, the court disagrees and concludes both that the CSM correctly applied the *Lombardi* standard and that the CSM's finding that petitioner did not suffer from ADEM was not arbitrary or capricious.  Accordingly, the court will affirm the CSM's decision.

# I. BACKGROUND

## A. Petitioner's Recent Medical History

On February 22, 2008, petitioner received an influenza vaccination.  Pet'r's Ex. 2 at 2.  In the months following her vaccination, petitioner experienced a series of physical ailments, including vertigo, nausea, dizziness, fatigue, numbness, and others.  Pet'r's Ex. 2, 3, 4, 7.  Because physicians could not ascertain the cause of these symptoms, petitioner sought the opinions of practitioners from several fields of medicine.  *Id.*

On April 28, petitioner visited Chierry Anderson Poyotte, a doctor of internal medicine, and reported that she was suffering from right ear pain, weakness, and low energy, as well as vertigo and nausea.  Pet'r's Ex. 4 at 161.  Dr. Poyotte diagnosed petitioner with "otitis media," commonly known as an inner ear infection, and vertigo.  *Id.* at 163.  On April 30, petitioner returned to Dr. Poyotte, and stated that she continued to experience malaise and fatigue but Dr. Poyotte did not make any further diagnosis.  *Id.* at 154.

Petitioner then sought a second opinion from Natalie Ting, a doctor of osteopathic medicine, on May 6.  *Id.* at 147.  Petitioner described her symptoms as earache, fatigue, and dizziness.  *Id.*  She also stated that she had been experiencing numbness along the right side of her body for the past three weeks.  *Id.*  Dr. Ting did not offer a diagnosis but noted that, in her opinion, petitioner's exam results were not consistent with the described symptoms.  *Id.* at 149.

On May 9, petitioner visited a second doctor of internal medicine, Kijung Paul Sung, reporting many of the same symptoms that she had reported to previous doctors, including vertigo, dizziness, fatigue, and numbness along the right side of her body.  *Id.* at 139-140.  Dr. Sung recommended, and petitioner underwent, a computer tomography ("CT") scan and magnetic resonance imaging ("MRI") of petitioner's brain, both of which produced "unremarkable," or normal, results.  *Id.* at 142-3.[2]

---

[2] Magnetic Resonance Imaging is "a method of visualizing soft tissues of the body by applying an external magnetic field that makes it possible to distinguish between hydrogen atoms in

On May 27, petitioner checked-in to an emergency room after experiencing vertigo, anomalous tastings, numbness and weakness on her right side, and difficulty speaking and coordinating muscle movements. Pet'r's Ex. 4 at 128. Attending physicians conducted an MRI of petitioner's brain and cervical spine. *Id.* at 127. Neither test revealed a notable physical abnormality and physicians noted that the cause of her symptoms was "unclear" at that time. *Id.* at 128.

Petitioner next sought out a neurologist, David Shaw, on June 9, complaining of unsteady gait, blurred vision, generalized weakness, and intermittent neck pain, in addition to her previous symptoms. *Id.* at 114. Dr. Shaw suspected petitioner was afflicted with multiple sclerosis ("MS")[3] and ordered a visual evoked response test to confirm his diagnoses. *Id.* at 115. But, Dr. Shaw noted the lack of lesions or other "obvious evidence" of MS on petitioner's MRI. On June 10, petitioner underwent an electroencephalogram ("EEG") test and visual evoked response test, receiving normal results. *Id.* 111, 120.[4]

Also on June 10, petitioner visited a second neurologist, William Miller, and relayed similar, but "progressively worsen[ing]," symptoms. Pet'r's Ex. 3 at 155. During this visit, petitioner mentioned, for the first time, that for "several weeks" prior to the onset of her initial

---

different environments." *Dorland's* at 916. Medical professionals use magnetic resonance imaging to observe lesions in the brain of patients that are suspected to have demyelinating diseases such as MS and ADEM.

Computer Tomography (also known as "CT scans" or "CAT scans") "combines a series of X-ray views taken from many different angles and computer processing to create cross-sectional images of the bones and soft tissues inside [the] body." *See* Mayo Clinic definition, available at http://www.mayoclinic.org/tests-procedures/ct-scan/basics/definition/prc-20014610.

[3] Multiple sclerosis is a disorder of the central nervous system that produces clinical symptoms such as "weakness, incoordination, paresthesia, speech disturbances, and visual complaints." *Dorland's* at 1706. It is characterized by "[centers] of demyelination throughout the white matter of the central nervous system, sometimes extending into the gray matter." *Id.*

Demyelination, in turn, is a medical term for deterioration or damage to the protective coating (i.e., the "myelin sheath") that surrounds the nerve fibers in the body's brain and spinal cord. *Dorland's* at 493. There are three variants of inflammatory demyelination diseases: MS, acute-disseminated encephalomyelitis ("ADEM"), and acute hemorrhagic leukoencephalitis. *Id.*

[4] An electroencephalogram test ("EEG") is "a recording of the potentials of the skull generated by currents emanating spontaneously from nerve cells to the brain. The normal dominant frequency of these potentials is about 8 to 10 cycles per second and the amplitude about 10 to 100 microvolts. Fluctuations in potential are seen in the form of waves, which correlate well with neurologic conditions and so are used in diagnostic criteria." *Dorland's* at 607.

A visual evoked response test, also known as a visual evoked potential study, measures "changes in the evoked cortical potential when the eye is stimulated by light." *Dorland's* at 1496. Stated otherwise, the test uses electrodes to measure the time it takes for nerves to respond to optical stimulation.

symptoms, she had experienced a sensation that her "socks seemed too tight" against her legs. *Id.* Dr. Miller considered several diagnoses, including MS, but was puzzled by the lack of a lesion on petitioner's MRI to explain the symptoms and noted that it was "hard to localize [a] lesion that would explain all of her symptoms." *Id.* at 158.

On July 17, a test of petitioner's cerebrospinal fluid displayed indicia of MS. Pet'r's Ex. 7 at 14-15. On August 2, 2008, an MRI revealed an "unusual lesion" providing evidence of a demyelinating disease. Pet'r's Ex. 3 at 123.

On August 20, petitioner met with a third neurologist, Christopher Di Stasio. Pet'r's Ex. 4 at 68-72. During her appointment, petitioner conveyed that, while her vertigo and numbness were improving, other symptoms remained constant. *Id.* at 73. Dr. Di Stasio noted that petitioner was "starting to slowly improve." *Id.* at 71.

On September 8, petitioner returned to Dr. Miller, who diagnosed her with a demyelinating disease that he believed was "improving slowly." Pet'r's Ex. 3 at 102. On March 20, 2010, petitioner underwent another brain MRI. *Id.* at 61. The results demonstrated improvement and reinforced Dr. Miller's diagnosis of a probable "monophasic demyelinating event." Pet'r's Ex. 7 at 7. This diagnosis was confirmed on July 30, 2010, when Dr. Sung diagnosed petitioner with a demyelinating disease and fibromyalgia. *Id.* at 25. After visiting more than six different physicians, petitioner was finally diagnosed with a demyelinating disease.

**B. Proceedings Before the Chief Special Master**

On February 7, 2011, petitioner filed a request for compensation under the Vaccine Program, 42 U.S.C. §§ 300aa–1 to –34, which allows petitioners to seek compensation if they have "sustained, or ha[ve] significantly aggravated" any "vaccine-related" "illness, disability, injury, or condition." § 300a-11(c)(1)(C). The parties, however, disagree about the nature of petitioner's injury, and whether petitioner's alleged injury can be caused by flu vaccination. Petitioner and respondent each proffered expert reports on this issue.

**1. Petitioner's Expert**

Petitioner filed the report of Dr. Marcel Kinsbourne, a neurologist and author of many medical books, articles, and other medical-related literature. Pet'r's Ex. 8. Dr. Kinsbourne's opinion, petitioner suffered from "a variant of ADEM" distinguished by its "subacute," or delayed, onset. Pet'r's Ex. 8 at 6. Dr. Kinsbourne stated that ADEM typically manifests within "a few days or weeks." *Id.* Dr. Kinsbourne believed this was consistent with petitioner's condition, which set in "[a]pproximately four weeks" following petitioner's vaccination in the third week of March of 2008 and "progressed for several months before it stabilized." *Id.* at 5; *see also* Tr. at 9, 25. In the evidentiary hearing, Dr. Kinsbourne averred that it is possible for ADEM to set in subacutely, taking up to 42 days to surface. Tr. 34. In support of this assertion, Dr. Kinsbourne cited a 1994 Institute of Medicine report, which stated that the latency for ADEM can be between "5 days to 6 weeks," as well as two other documents,[5] referred to as the Singh and Leake articles. Tr. 34; Pet'r's Ex. 8-6 at 503.

---

[5] Pet'r's Ex. 8-6 at 503, Surendra Singh et al., *Acute Disseminated Encephalomyelitis: MR Imaging Features*, 173 AJR 1101 (1999); Pet'r's Ex. 8-4 at 387, John A.D. Leake et al., *Acute*

Dr. Kinsbourne also relied on an article referred to by the parties as the "Sejvar" article.[6] Tr. 30, 50-55, 156.  The Sejvar article establishes criteria for various levels of "diagnostic certainty" in identifying ADEM.  *Id.*  Among others, the Sejvar article cited (1) single brain lesion, (2) trouble finding words, (3) cranial nerve abnormalities, (4) motor weakness, (5) sensory abnormalities, (6) ataxia (uncoordinated movement) and gait dysfunction, and (7) arm tremors as indicia of ADEM.  *Id.* at 5776-79.  Dr. Kinsbourne averred that petitioner suffered from five of these symptoms: "decreased arousability, aphasia [or language comprehension difficulty], motor weakness, sensory abnormalities, and ataxia."  Pet'r's Ex. 9 at 1-2.  Notably, the Sejvar article states that an ADEM diagnosis must include discovery of diffuse or multi-focal white matter lesions.  Tr 75-76.  Dr. Kinsbourne stated that petitioner's MRI results were consistent with a diffused white matter lesion and, thus, with ADEM.  *Id.* at 76.

Dr. Kinsbourne also attested to the causal connection between the flu vaccine and ADEM, calling the link "rare" but "well recognized."  Pet'r's Ex. 8 at 7-9 (citing Hiroshi Shoji & Mashahide Kaji, *The Influenza Vaccination and Neurological Complications*, 42:2 THE JAPANESE SOC'Y OF INTERNAL MED. 1 (2003)).  He discounted a 2011 study by the Institute of Medicine that determined there was insufficient evidence to establish a causal relationship between the flu vaccine and ADEM.  Tr. 78.

**2. Respondent's Expert**

Respondent presented the report of Dr. Jeffrey Allen Cohen, a clinical neurologist, professor of neurology at Dartmouth medical school, and chief neurologist at Dartmouth Hitchcock Medical Center.  Resp't's Ex. A; *see also* Tr. 102.  Dr. Cohen averred that petitioner did not suffer from ADEM.  Resp't's Ex. A at 1.  In his opinion, petitioner's "clinical picture was not consistent with [that] diagnosis."  *Id.* at 6.  Dr. Cohen also stated that the duration of petitioner's symptoms was "very atypical for ADEM—[a disease which generally] progresses over weeks, not months."  Resp't's Ex. A at 2.  In Dr. Cohen's view, onset of ADEM, is almost always acute and even a subacute onset of more than four weeks is "very unusual."  *Id.* at 5; *see also* Tr. 141-42.  Dr. Cohen testified that in his clinical experience, the outer range for onset of ADEM symptoms is four weeks after the vaccination or infection.  Tr. 155-56.

Dr. Cohen further noted that ADEM is a disease "that is severe and swift in its onset, reaches a nadir, and then . . . gets better . . . to a great degree."  Tr. 178.  Dr. Cohen stated that the majority of ADEM patients' symptoms "tend[] to resolve over a period of . . . two, three, or four months."  Tr. 119.  In Dr. Cohen's opinion, petitioner's condition was not consistent with this timetable because her physicians' treatment choices indicated they believed that "she was getting worse."  Tr. 117.

Dr. Cohen also commented that although there is no "specific marker" for ADEM, it would be "very unusual" for a patient not to exhibit diffused or multifocal white matter lesions.

---

*Disseminated Encephalomyelitis in Childhood: Epidemiologic, Clincal and Laboratory Features*, 23:8 PEDIATRIC INFECTIOUS DISEASE J. 756 (2004).

[6] Pet'r's Ex. 9-1, James J. Sejvar et al., *Encephalitis, myelitis, and acute disseminated encephalomyelitis (ADEM): Case definitions and guidelines for collection, analysis, and presentation of immunization safety data*, 25 VACCINE 5771 (2007).

Tr. 107-108.   Dr. Cohen did not observe any evidence of white matter lesions on either of petitioner's MRI exams taken in May of 2008.  Tr. 114.  He also stated that there was no record of petitioner suffering from facial weakness, a common and readily noted ADEM indicator.  Tr. 113-14.   Further, Dr. Cohen believed that the lack of a "markedly depressed level of consciousness" indicated petitioner did not suffer from ADEM.  Resp't's Ex. C at 1.

Additionally, Dr. Cohen contended that petitioner's medical history did not support an ADEM diagnosis because petitioner's symptoms were not "diagnosis-specific neurologic findings." *Id.*  Dr. Cohen observed that symptoms such as decreased arousability, aphasia, motor weakness, sensory abnormalities, and ataxia can indicate conditions such as stroke, traumatic brain injury, or MS. *Id.*  He also stated that the location of petitioner's demyelination, on her brain stem, "is not the usual location for ADEM" and the area of demyelination was not "as extensive" as Dr. Cohen would expect in an ADEM case.  Resp't's Ex. A at 2.  Dr. Cohen also argued that "ADEM is a disease [that appears] almost exclusively . . . in children and adolescents" and noted that petitioner was in her 50's at the time of vaccination.  *Id.* at 3.

Dr. Cohen critiqued Dr. Kinsbourne's statements, arguing that Dr. Kinsbourne cited to medical articles that were not applicable to petitioner's clinical picture.  *Id.* at 3; Resp't's Ex. C at 1.  In Dr. Cohen's opinion, medical literature does not present "reliable evidence" that the flu vaccine can cause ADEM.  Tr. 169-70.

## C. The Chief Special Master's Decision

On June 17, 2013, the CSM issued a decision denying compensation under the Vaccine Act.  The CSM considered the evidence in the record, including Dr. Kinsbourne and Dr. Cohen's reports and testimony, and disagreed with Dr. Kinsbourne's assertion that petitioner's condition was an "atypical ADEM variant." *Stillwell I* at 16.  Rather, the CSM found that the following six factors "weigh against a finding that petitioner has ADEM." *Id.*

First, the CSM found that "although it is not dispositive," the statistics presented by both experts on the typical age of patients who develop ADEM warranted consideration.  *Id.* at 16-17.  The CSM noted that Dr. Kinsbourne and Dr. Cohen agreed that ADEM "primarily afflicts children and adolescents."  *Id.* at 16-17 (citing Tr. 29, 38).  Cases of ADEM in adults are less common but have been reported "in young and elderly adults." *Id.* at 16-17.  Petitioner, 53 at the time of vaccination, does not qualify for either of these groups.  The CSM considered the statistical unlikelihood that petitioner suffered from an adult, middle-aged case of ADEM.

Second, the CSM observed that none of the petitioner's numerous physicians diagnosed her with ADEM.  *Id.* at 17.  The CSM noted that petitioner's treating physicians speculated her condition might be due to MS before eventually diagnosing her with a general demyelinating brain disorder.  *Id.*  The CSM found that, contrary to Dr. Kinsbourne's assertions, the treatment prescribed to petitioner by her physicians was not consistent with ADEM. *Id.*

The nature of petitioner's brain lesion formed the third basis for the CSM's findings.  *Id.* at 18-20.  It is uncontroverted that petitioner suffered from a brain lesion.  *Id.*  But, the parties' experts disagree on whether petitioner's lesion was diffuse or multifocal, the latter being a necessary condition for ADEM.  *Id.*  Dr. Kinsbourne contended that petitioner's solitary brainstem lesion was both single and "diffused," and was consistent with "classical descriptions of ADEM" lesions.  *Id.* (quoting from Tr. 22).  Dr. Cohen argued that a solitary brainstem lesion

was atypical, and cited articles describing lesions in ADEM patients as "typically reveal[ing] multifocal, bilateral, often large white matter lesions." *Id.* (quoting Resp't's Ex. A-9 at 2). The CSM concluded that "[w]hether petitioner's brain lesion bore the appearance of the type of lesion usually seen in ADEM subjects is not clear from the record." *Id.* at 20. The parties' experts could not interpret petitioner's test results because the images were not available. *Id.* Consequently, the CSM determined that Dr. Kinsbourne's contention that petitioner's lesion "was sufficiently diffuse" to demonstrate ADEM was not persuasive because "petitioner's own treating physicians," who were able to review the image results, "were not persuaded." *Id.*

Fourth, the CSM found that the timing of petitioner's symptoms was inconsistent with ADEM. *Id.* 21-25. Petitioner was vaccinated on February 22, 2008. Pet'r's Ex. 2 at 1. She reported her initial symptom, vertigo, during an April doctor's visit, stating that her symptoms dated back "several weeks." Pet'r's Ex. 3 at 159-60. On June 20, petitioner told her physicians that "on reflection" she had noticed that her "socks seemed too tight on [her] legs" for several weeks prior to the onset of her vertigo symptoms. *Id.* The CSM commented that "petitioner's own accounts of her symptom onset [are] inconsistent." *Id.* The CSM then summarized the medical literature presented by the parties' experts and concluded that it is "clear that ADEM most commonly manifests abruptly, although several of the articles Dr. Kinsbourne cited furnished the barest of support for his proposition that petitioner's subacute onset was an appropriate—even if aberrant—presentation of ADEM." *Id.* at 24. The CSM concluded that "[t]he timing of petitioner's symptom onset was unusually protracted" and "does not fit within the recognized time frame for most cases of ADEM." *Id.* at 25.

Fifth, the CSM further noted that the nature and severity of petitioner's symptoms was not indicative of ADEM. *Id.* at 25-27. Dr. Kinsbourne and Dr. Cohen agreed that decreased level of consciousness, sometimes resulting in coma, is a common symptom of ADEM. *Id.* Petitioner did not exhibit this symptom. *Id.*

The parties disputed whether the ADEM symptoms petitioner did exhibit rose to the level of typical ADEM symptoms. *Id.* The CSM found that "[t]he views of the parties' experts are inconclusive" because they did not have the opportunity to observe petitioner firsthand. *Id.* As a result, the CSM was "informed . . . by the silence of petitioner's treaters—who did observe her—on the matter of her symptom severity." *Id.* The CSM determined that the lack of evidence demonstrating decreased consciousness and relatively low symptom severity suggested petitioner did not suffer from ADEM. *Id.*

Finally, the CSM found that the protracted course of petitioner's injury and limited recovery demonstrated that her condition was not caused by ADEM. *Id.* at 27-28. The CSM stated that "[t]he record indicates that petitioner's condition did not plateau and then gradually improve—as would be expected with a case of ADEM. Instead, petitioner struggled . . . with a protracted clinical course marked by many periods of exacerbation." *Id.* The CSM concluded that the "course of petitioner's illness strongly suggests that she did not suffer from ADEM" and that "[p]etitioner's overall clinical course was inconsistent with the well-recognized course of ADEM." *Id.*

Weighing these six factors, the CSM determined that petitioner "failed to prove by preponderant evidence that she developed ADEM." *Id.* at 28. Rather, the CSM found that petitioner "appear[s] to suffer from another, unspecified illness that has bewildered her

physicians." *Stillwell I* at 16.  Relying on precedents set by the Court of Appeals for the Federal Circuit ("Federal Circuit") in *Broekelschen* and *Lombardi*, the CSM concluded that the failure of petitioner to establish the alleged injury of ADEM precluded the CSM from finding that this injury had been caused by petitioner's flu vaccination.  In light of this ADEM failure of proof, the CSM determined that petitioner was not entitled to compensation under the Vaccine Act.  *Id.*  Nonetheless, in "an abundance of caution," the CSM proceeded to apply the *Althen* test for causation, and concluded that petitioner failed to satisfy this test.

On July 9, 2013, petitioner filed a timely motion to review the CSM's decision.  This matter is now ripe for decision.

## II. STANDARD OF REVIEW FOR VACCINE ACT CASES

The Court of Federal Claims has jurisdiction to review the decision of a special master in a Vaccine Act case upon a properly filed petition for review.  42 U.S.C. § 300aa—12(e)(1).  When reviewing a special master's decision, the court must take one of the following three courses of action:

(A) Uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) Set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) Remand the petition to the special master for further action in accordance with the court's decision.

42 U.S.C. § 300aa–12(e)(2).

In Vaccine Act cases, the court applies different standards of review to different aspects of a special master's decision: the court reviews conclusions of law under the "not in accordance with law" standard, findings of fact under the deferential arbitrary and capricious standard, and discretionary rulings under the abuse of discretion standard.  *Masias v. Sec'y of Health & Human Servs.*, 634 F.3d 1283, 1287-88 (Fed. Cir. 2011) (construing 42 U.S.C. § 300aa–12(e)(2)(B)); *see also Munn v. Sec'y of Dep't of Health & Human Servs.*, 970 F.2d 863, 871 no. 10 (Fed. Cir. 1992); *Pafford v. Sec'y of Health and Human Servs.*, 64 Fed. Cl. 19, 27 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006).

With regard to a special master's conclusions of law, such as conclusions regarding legal standards and burdens of proof, the court applies the "not in accordance with law standard."  *Doe 93 v. Sec'y of Health & Human Servs.*, 98 Fed. Cl. 553, 566 (2011).  Under this legal standard, a special master's application of the law is not entitled to any deference.  *Jarvis v. Sec'y of Health and Human Servs.*, 99 Fed. Cl. 47, 58 (2011); see also *Althen*, 418 F.3d at 1278–79 (observing that this court's "not in accordance with law" review of a special master's decision in a Vaccine Act case is de novo); *Saunders v. Sec'y of Dep't of Health & Human Servs.*, 25 F.3d 1031, 1033 (Fed. Cir. 1994) ("Because [the special master's award of attorneys' fees] is a legal question, we

apply the "not in accordance with law" standard. Thus, we review the special master's award de novo . . .").

In contrast, a special master's findings of fact are reviewed under the arbitrary and capricious standard, which is "well understood to be the most deferential possible." *Munn*, 970 F.2d at 870. "Congress assigned to a group of specialists, the Special Masters within the Court of Federal Claims, the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims." *Deribeaux ex rel. Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1366 (Fed. Cir. 2013) (quoting *Hodges v. Sec'y of Dept. of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (internal citations omitted)).

Accordingly, it is not the role of this court to "reweigh the factual evidence," "assess whether the special master correctly evaluated the evidence," or "examine the probative value of the evidence or the credibility of the witnesses." *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2010). "If the special master 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate.'" *Hibbard v. Sec'y of Health & Human Servs.*, 698 F.3d at 1363 (quoting *Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Human* Servs., 940 F.2d 1518, 1528 (Fed. Cir. 1991)). In other words, the court is "not to second guess [a] [s]pecial [m]aster's fact-intensive conclusions; the standard of review is uniquely deferential for what is essentially a judicial process." *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

Finally, the court reviews a special master's discretionary rulings for "abuse of discretion." *Munn*, 970 F.2d at 870 n. 10. Such rulings typically include review of evidentiary rulings. *See, e.g. Piscopo v. Sec'y of Health & Human Servs.* 66 Fed. Cl. 49, 53 (2005). "An abuse of discretion may be found when (1) the court's decision is clearly unreasonable, arbitrary, or fanciful; (2) the decision is based on an erroneous conclusion of the law; (3) the court's findings are clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision." *Hendler v. United States,* 952 F.2d 1364, 1380 (Fed. Cir. 1991); *Woods v. Sec'y of Health & Human Servs.*, 105 Fed. Cl. 148, 151 (2012).

### III. DISCUSSION

**A. Vaccine Act Standards**

The Vaccine Act, 42 U.S.C. §§ 300aa–1 to –34, established the National Vaccine Injury Compensation Program to compensate individuals injured by vaccines "quickly, easily, and with certainty and generosity." H.R. Rep. No. 99–908, at 6 (1986), 1986 U.S.C.C.A.N. at 6344. The Vaccine Act allows petitioners to seek compensation if they have "sustained, or ha[ve] significantly aggravated" any "vaccine-related" "illness, disability, injury, or condition" caused by a vaccine. 42 U.S.C. § 300a-11(c)(1)(C).

The Act provides petitioners two avenues for obtaining compensation: "table" and "off-table" claims. *W.C. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1355 (Fed. Cir. 2013). In a table claim, if the petitioner can demonstrate that they received a vaccine listed in the Vaccine Injury Table and that they suffered an injury within the time period defined by the table, the

petitioner "benefits from a statutory presumption of causation." *Id*.  But if the injury is not listed in the table, the petitioner must establish actual causation "by a preponderance of the evidence." *Id*.; 42 U.S.C. § 300aa-13(a)(1).  Stated another way, a petitioner making an off-table claim must present evidence showing that the vaccine "more likely than not" caused the injury.  *Capizzano v. Sec'y of Health & Human Servs*., 440 F.3d 1317, 1326 (Fed. Cir. 2006).  Since ADEM is not an injury listed on the Vaccine Injury Table, *see* 42 C.F.R. § 100.3, this case presents an off-table claim.

In order to meet the preponderance of the evidence requirement for successfully bringing an off-table claim, the petitioner has the burden of satisfying the following three-prong test set forth in *Althen v. Sec'y of Health & Human Servs*.:

> Concisely stated, [petitioner's] burden is to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.  If [petitioner] satisfies this burden, she is entitled to recover unless the [government] shows, also by a preponderance of evidence, that the injury was in fact caused by factors unrelated to the vaccine.

418 F.3d 1274, 1278 (Fed. Cir. 2005).

In *Althen*, the Federal Circuit emphasized that the Vaccine Act does not require exact or conclusive evidence of causation, but a medically credible theory coupled with evidence of a proximate temporal and causal relationship between the injury and the vaccination.  *See Althen*, 418 F.3d at 1281-1282 (stating that "the purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field bereft of complete and direct proof of how vaccines affect the human body").

Generally speaking, this standard simply requires the special master to consider whether there is preponderant evidence showing that the vaccine caused the alleged injury.  "The function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine based on the record evidence as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused [petitioner's] injury."  *Lombardi*, 656 F.3d at 1352-53 (quoting *Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Human Servs*., 569 F.3d 1367, 1382 (Fed. Cir. 2009)).

Although the Vaccine Act does not require absolute precision, it does require the petitioner to establish an injury—the Act specifically creates a claim for compensation for "*vaccine-related* injury or death."  42 U.S.C. § 300aa-11(c) (emphasis added).  Accordingly, the Federal Circuit has held, in a series of recent decisions beginning with *Broekelschen v. Sec'y of Health and Human Servs*., 618 F.3d 1339 (Fed. Cir. 2010), that if the special master finds, as a preliminary matter, that petitioner has failed to substantiate the alleged injury, the special master need not apply the *Althen* test for causality.

- 10 -

In *Broekelschen*, the petitioner experienced symptoms attributable to either transverse myelitis ("TM") or anterior spinal artery syndrome, and had received differential diagnoses for those two conditions.  Petitioner argued that his flu vaccination caused him to suffer TM, a neurological disorder that has been causally connected with the flu vaccine.  Respondent disputed this assertion, and argued that petitioner had suffered anterior spinal artery syndrome, a vascular disorder that is not caused by the flu vaccine.  *See id.* at 1342-44.  The Special Master found that the record supported respondent's position, and denied the petition without applying the *Althen* test.

The *Broekelschen* court observed that "the instant action is *atypical* because the injury itself is in dispute, the proposed injuries differ significantly in their pathology, and the question of causation turns on which injury [petitioner] suffered." *Id.* at 1346 (emphasis added).  The court, in a 2-1 opinion, upheld the Special Master's approach, stating that "[m]edical recognition of the injury claimed is critical and by definition a 'vaccine-related injury' . . . has to be more than just a symptom or manifestation of an unknown injury." *Id.* at 1349.   The court distinguished the case from *Andreu*,

> "where the parties agreed that the petitioner suffered from a seizure disorder . . . or *Kelley*, where the competing diagnoses were variants of the same disorder . . . . Here, nearly all of the evidence on causation was dependent on the diagnosis of [petitioner's] injury.  Therefore, it was appropriate for the special master to first find which of [petitioner's] diagnoses was best supported by the evidence presented in the record before applying the *Althen* test."

*Id.* at 1346 (discussing *Andreu*, 569 F.3d at 1378 and *Kelley Sec'y of Health and Human Servs.*, 68 Fed. Cl. 84, 100-01 (2005)).

In *Lombardi*, the Federal Circuit also affirmed a special master assessing the injury claimed by petitioner without applying the *Althen* test.  *Lombardi*, 656 F.3d at 1352-53.  The petitioner in that case was afflicted with pain radiating into her right chest and with chronic fatigue, beginning shortly after she had received a third dose of the hepatitis B vaccine.  The petitioner visited a number of doctors, who struggled to identify the etiology of her condition. The petition itself "did not identify any injuries, but claimed that [petitioner] had sought frequent medical treatment following the vaccination." *Id.* at 1348.  The petitioner's expert witnesses suggested several possible conditions that had been causally associated with the hepatitis B vaccine but were not listed on the Vaccine Injury Table.  Respondent's witnesses argued that petitioner did not suffer from any of these conditions, but suggested several alternatives not causally associated with the vaccine.  *See id.* at 1345-49.

The Special Master in *Lombardi* analyzed the evidence in the record and concluded that petitioner had "not established that she suffers from any of the three conditions that provide the basis for her experts' opinions." *Id.* at 1349 (quoting *Doe 60 v. Sec'y of Health & Human Servs.*, No. 99–VV–523, 2010 WL 1506010 (Fed. Cl. Mar. 26, 2010)).  The Special Master found the cause of petitioner's condition elusive and denied compensation under the Vaccine Act, without reaching the *Althen* test.  *Id.*  The Federal Circuit affirmed the Special Master's approach, holding that "[i]n the face of such extreme disagreement among well-qualified medical experts, each of whom had evaluated the petitioner, it was appropriate for the Special Master to first

determine what injury, if any, was supported by the evidence in the record before applying the *Althen* test to determine causation.   In the absence of *any* specific injury of which petitioner complains, the question of causation is not reached."   *Lombardi*, 656 F.3d at 1352-53 (emphasis added) (internal citations removed).

Initially, the scope of the *Broekelschen* and *Lombardi* opinions was subject to dispute. Previous opinions on this court, for instance, have narrowly characterized *Broekelschen* and *Lombardi* as "exceptions to the general rule" that "a special master should not conduct a differential diagnosis, at the outset of the causation analysis, to choose one diagnosis over another, or over a combination of diagnoses."   *Contreras v. Sec'y of Health and Human Servs.*, 107 Fed. Cl. 280, 293 (2012).   The court, in *Contreras*, argued that *Broekelschen* only applied in cases where "two competing diagnoses of dissimilar diseases" are presented.   *Id*. at 293.   That opinion characterized the injury analysis from *Broekelschen* and *Lombardi* "as a first step in the causation analysis."   *Id*.   The *Contreras* court construed *Lombardi* narrowly, limiting it to "an unusual case where: (1) the petitioner presents conflicting diagnoses of her alleged vaccine injury; (2) the experts have 'extreme disagreement' as to the malady suffered; and (3) the diagnoses are not along a continuum of similar conditions."   *Id*. at 294-95.

In the meantime, the Federal Circuit has taken a different approach.   Several months after *Contreras* was decided, the Federal Circuit issued *Hibbard v. Sec'y of Health and Human Services*, 698 F.3d 1355 (2012), a case that expanded the scope of the *Broekelschen* and *Lombardi* rulings.   *Hibbard*, unlike *Broekelschen* and *Lombardi*, did not feature dueling theories of the nature of the injury afflicting the petitioner.   In *Hibbard*, it was uncontroverted that petitioner suffered from dysautonomia, a dysfunction of the automatic nervous system.   *Id*.   The only dispute was whether a flu vaccination caused petitioner to suffer postural orthostatic tachycardia syndrome ("POTS"), a limited form of autonomic neuropathy that manifests itself as dysautonomia, or whether petitioner's dysauonomia was caused by some other factor.   *Id*. Respondent challenged whether petitioner could prove by a preponderance of the evidence that petitioner had suffered POTS, but in contrast to *Broekelschen* and *Lombardi*, did not offer any alternate theory of causation.   *Id*.   The Special Master found the evidence for POTS inconclusive, and denied compensation without applying *Althen*.   *Id*.   Petitioner, in response, argued that this approach conflicted with the burden-sharing test set forth in *Althen*. *Id*.

The Federal Circuit, in *Hibbard*, upheld the Special Master's decision, without any of the qualifying language used in *Broekelschen* and *Lombardi*.   The court held that:

> "[i]f a special master can determine that a petitioner did not suffer the injury that she claims was caused by the vaccine, there is no reason why the special master should be required to undertake and answer the separate (and frequently more difficult) question whether there is a medical theory, supported by 'reputable medical or scientific explanation,' by which a vaccine can cause the kind of injury that the petitioner claims to have suffered."

*Hibbard*, 698 F.3d at 1365.   The court explicitly expanded the scope of the injury inquiry by contrasting the facts of the case with "previous cases" like *Lombardi* and *Broekelschen*, in which there was an actual dispute as to which injury afflicted the petitioner.   *See also Hibbard*, 698

F.3d at 1370-71 (O'Malley, J., dissenting) (criticizing the majority for extending *Broekelschen* "well beyond its facts").

This approach also differs markedly from the "general rule" that a special master should avoid selecting among differential diagnoses—the court held that "even assuming the medical plausibility of [petitioner's] theory of causation—that the vaccine triggered an immune response that damaged her autonomic nerves—her failure to show that she had autonomic neuropathy would be fatal to her case" because "whether [petitioner] suffers from autonomic neuropathy . . . was a necessary component to her theory of vaccine-induced injury." *Id.* at 1365. *C.f. Andreu*, 569 F.3d at 1378 (holding that petitioner was not required to prove whether petitioner had suffered a febrile or afebrile seizure because the parties agreed that toxins in the TBT vaccine can cause seizures, even if there was disagreement in the scientific literature as to whether the vaccine could cause afebrile seizures); *Kelley*, 68 Fed. Cl. at 100-01 (2005) (holding that petitioner was not required to precisely categorize his injury where the two possible diagnoses were "variants of the same disorder").

## B. Review of the Special Master's Decision

### 1. The Special Master Correctly Applied the Law

Petitioner argues that "the Chief Special Master erred as a matter of law in applying the *Lombardi* approach to the present case" because this case "involv[ed] a question as to the classification of a disease within an identified disease process, rather than whether an unidentified disease process exists." *Id.* at 14.  In essence, petitioner contends that the CSM errantly treated the uncertainty as to the *sub-type* of petitioner's demyelinating encephalomyelitis (ADEM, MS, or other) as if the cause of petitioner's injuries was unknown. *Id.*  Petitioner argues that "the sub-classification . . . is of assistance [solely] for medical purposes, in the treatment of the disease process." *Id.* at 5.  Petitioner asserts that she undisputedly "suffers from an acquired demyelinating encephalomyelitis involving lesions at the pons and mid-areas of her brain." Pet'r's Mot. at 4.

As explained above, the court reviews legal conclusions, such as the CSM's decision to apply *Lombardi*, under the "not in accordance with law" standard. *Masias*, 634 F.3d at 1287-88 (construing 42 U.S.C. § 300aa–12(e)(2)(B)).

Applying this standard, the court affirms the CSM's application of *Lombardi*.  Petitioner simply misstates the law as it currently stands.  Although the Federal Circuit has continued to recite the general principle that it is not the role of a special master to engage in differential diagnosis, the Federal Circuit has increasingly emphasized that a petitioner must, as a preliminary matter, establish a specific injury in order for the *Althen* test to come into play. Critically, Federal Circuit precedent dictates that the petitioner has the burden of proving, by the preponderance of the evidence, that they are actually afflicted by the injury which, *under their theory of vaccine-induced injury*, was caused by the vaccine. *See Hibbard*, 698 F.3d at 1365.  A "vaccine-related injury" must be "more than just a symptom or manifestation of an unknown injury[;]" "[m]edical recognition of the injury claimed is critical." *Broekelschen*, 618 F.3d at 1349.

The court is not persuaded by petitioner's argument that a precise ADEM diagnosis is not necessary.  Petitioner's ADEM diagnosis is clearly a "necessary component to her theory of

vaccine-induced injury." *Hibbard*, 698 F.3d at 1365. This is demonstrated by the fact that *the evidence presented before the CSM related to ADEM*, not demyelinating diseases generally or other demyelinating diseases. Petitioner's expert witness specifically alleged that petitioner suffered from "an atypical example of the subacute onset of demyelinating brain stem encephalitis, a variant of ADEM." Pet'r's Ex. 8 at 3. Moreover, petitioner cited studies by Poser (1982), Saito et al. (1980), Shoji and Kaji (2003), Miyamoto et al. (1996), Ravaglia et al. (2004), etc. in support of the proposition that ADEM, in particular, can be triggered by the flu vaccine. *Id*. at 4-5. As respondent notes, "[t]he theories put forth by petitioner's expert all relied on a diagnosis of ADEM, and thus this particular diagnosis lies at the very crux of petitioner's case-in-chief." Res. at 9. Thus, *Hibbard* dictates that petitioner's failure to establish that she has ADEM is fatal to her case.

For these reasons, the court finds that the CSM did not err by considering whether petitioner had demonstrated she suffered from a vaccine-caused ADEM injury by a preponderance of the evidence in the record, as a predicate to applying the *Althen* test. Because petitioner's arguments and expert testimony centered on a diagnosis of ADEM, the CSM did not err in applying *Lombardi* once she determined that petitioner had not carried her burden of establishing that she suffered from ADEM.

### 2. The Special Master's Factual Findings Were Not Arbitrary or Capricious

Petitioner also argues that the CSM acted arbitrarily and capriciously in finding that petitioner had failed to prove, by a preponderance of the evidence, that she was suffering from ADEM. Pet'r's Mot. at 1. Petitioner insists that the CSM erroneously focused on whether petitioner was actually suffering from ADEM, "rather than whether [p]etitioner's disease was within the medically accepted guidelines of ADEM." Pet'r's Mot. at 14. Petitioner acknowledges that her symptoms do not match those typically exhibited by ADEM patients, but insists that she suffers from an "atypical" variant of ADEM. *Id*. at 1.

As explained above, the CSM cited the following six reasons for finding that petitioner was not suffering from ADEM, or even an "atypical" variant thereof: (1) the statistical probability that petitioner suffers from ADEM, (2) the absence of an ADEM diagnosis from her treating physicians; (3) the appearance of her brain lesion in the MRI; (4) the slow onset of her symptoms; (5) the nature and severity of her symptoms; and (6) the protracted course of her illness and her limited recovery. *Stillwell I* at 16-28. In short, the CSM found that "petitioner's onset, symptoms, and the course of her illness *diverge in too many respects and by too great a degree* from the presentation of ADEM to even be deemed an atypical form of ADEM." *Id* (emphasis added).

Petitioner disputes the CSM's finding that Ms. Stillwell was not suffering from ADEM. Petitioner argues that it was improper for the CSM to consider that most victims of ADEM are young children or adolescents because Dr. Kinsbourne introduced evidence that it is possible for ADEM to afflict adults. Pet'r's Mot. at 5-6. Petitioner also argues that the absence of an ADEM diagnosis by any of petitioner's treating physicians is irrelevant because "a physician's purpose in classifying a disease process is to determine a course of medical treatment and prognosis – and not to establish a causative factor which may be necessary in a legal proceeding." *Id*. at 6. Additionally, petitioner acknowledges that ADEM usually produces separate, or multifocal, lesions that are visible in MRIs, but insists that several studies cited by Dr. Kinsbourne support

the possibility that some cases of ADEM may exhibit unifocal lesions.  *Id.* at 6-8.  Petitioner also acknowledges that the onset of ADEM symptoms is usually rapid, but argues that an onset of four weeks after the vaccination is nevertheless "within the generally acceptable onset."  *Id.* at 9-10.  Additionally, petitioner disputes respondent's argument that the severity of petitioner's symptoms was inconsistent with symptoms typically caused by ADEM.  *Id.* at 10-12.  Finally, petitioner argues that even if petitioner's protracted course of injury was atypical, it was still within the acceptable range for ADEM.  *Id.* at 12-13.

As explained in the preceding section, petitioner has the burden of establishing, by the preponderance of the evidence, that she actually suffers from the *specific* injury she alleges was caused by the vaccination.  *Hibbard*, 698 F.3d at 1365; *see also Broekelschen*, 618 F.3d at 1349 (holding that petitioner must establish that she suffers from a "vaccine-related injury," not merely "a symptom or manifestation of an unknown injury"); *Lombardi*, 656 F.3d at 1553 (holding that petitioner must successfully establish a "specific injury").  Whether petitioner has successfully satisfied this burden is clearly a factual question, which is reviewed under the arbitrary and capricious standard.  *See Hibbard*, 698 F.3d at 1363, 1365.  Under this deferential standard, the court must uphold factual findings if the special master has considered the record and made plausible inferences.  *Id.* at 1363 (quoting *Hines on Behalf of Sevier*, 940 F.2d at 1528).

Plainly, petitioner disagrees with the CSM's assessment of the evidence.  Nevertheless, the court finds that the CSM's factual findings are clearly supported by the record and therefore are not arbitrary and capricious.  As explained above, there is no specific marker for ADEM.  Rather, in identifying ADEM, both clinical findings and laboratory evidence must be taken into account.  Thus, in considering whether petitioner was suffering from ADEM or some other malady, the court finds that it was reasonable for the CSM to consider a number of probabilistic factors, such as the typical age of individuals afflicted by ADEM, the typical course of illness, severity of symptoms, and others.

The CSM summarized the typical characteristics of ADEM, and carefully elucidated six factors that weighed against a finding that petitioner was suffering from ADEM.  In light of the fact that petitioner's symptoms were undisputedly "atypical," not just in one respect but on multiple levels, the court concludes that the CSM's finding is substantially supported by the record on the whole.

Finally, petitioner's argument that the CSM should have focused on whether her "disease was within the medically accepted guidelines of ADEM" rather than whether petitioner actually suffered ADEM plainly misstates the law.  As explained in the preceding section, petitioner has an affirmative burden of showing, by the preponderance of the evidence, that she actually suffers from the specific injury she alleges was caused by the vaccination.  *Hibbard*, 698 F.3d at 1365.

For the foregoing reasons, the court finds that the CSM did not act arbitrarily or capriciously in finding that petitioner does not suffer ADEM.

\*\*\*\*\*\*\*\*\*\*

- 15 -

The *ratio decidendi* of the CSM's decision is that petitioner "failed to prove by preponderant evidence that she developed ADEM." *Stillwell I* at 28-29.  As the CSM noted, this determination "precludes a finding of causation" and thus obviates any need to apply the Althen test for causation.  *Id*. (citing *Lombardi*, 656 F.3d at 1352-53).

But, in "an abundance of caution" the CSM evaluated petitioner's claim under the *Althen* test's prongs.  *Stillwell I* at 29.  Because the CSM decided the case on *Lombardi* grounds, the CSM's *Althen* evaluation is *dicta*.  *See e.g. Cohens v. State of Virginia*, 19 U.S. 264, 399-400 (1821) (remarking that, with regard to *dicta*, "[i]t is a maxim not to be disregarded, that general expressions . . . are to be taken in connection with the case in which those expressions are used . . . The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. . . .").  Accordingly, the court does not reach the question of whether the CSM's determination that petitioner did not satisfy the *Althen* test was arbitrary or capricious.

## IV. CONCLUSION

In sum, the court affirms the Chief Special Master's determination that petitioner's claim fails under *Lombardi*.  Petitioner has not carried the burden of proving she suffers from a vaccine-related injury.  Accordingly, the Special Master's **DECISION** is **AFFIRMED** and petitioner's **MOTION** for review of that decision is **DENIED**.

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*

Lawrence J. Block
Judge